UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
Atlanta Division

DANIEL D. MACRIS,           *
                            *
    Plaintiff,              *     CIVIL ACTION
                            *
    -vs-                    *     FILE NO: _____
                            *
DICK'S SPORTING GOODS, INC.,*
                            *
    Defendant.              *

**<u>COMPLAINT</u>**

COME NOW DANIEL D. MACRIS, Plaintiff herein, and makes his

Complaint against DICK'S SPORTING GOODS, INC. as follows:

<u>NOTE</u>:      "*Incident*" means that occasion, on March 28, 2022, in Fulton
County, Georgia, when a golf ball hit by Plaintiff ricocheted off
of a portable practice hitting net, the "<u>Maxfli 8ft Instant Net
with Hitting Target for Practice Bundle, Style Number:
MX397</u>" ("*Maxfli 8x8 Instant Net*"), causing serious and
permanent injury to Plaintiff's left eye.

<u>JURISDICTION</u>

1.

Plaintiff is a citizen of the United States and a resident of Fulton County,

Georgia, whose true, fixed and permanent home address is 464 Michael Drive,

Alpharetta, Georgia 30009.

2.

Defendant DICK'S SPORTING GOODS, INC. ("DSG") is a foreign, for profit company incorporated in the State of Delaware with its principal office located at 345 Court Street, Coraopolis, Pennsylvania 15108.  Personal service may be perfected on Defendant by serving its Registered Agent, Corporation Service Company, at its Registered Address, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

3.

This is a personal injury tort case where the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is an action between citizens of different states.  Pursuant to 28 U.S.C. § 1332(a), this court has original jurisdiction of the present civil action based on complete diversity of citizenship between the parties.  Defendant is subject to the jurisdiction of this court and, pursuant to LR 3.1(B)(2) & (3) NDGa., venue is proper.

THE DEFECTIVE PRODUCT

4.

The product at the center of this action is a "Maxfli 8ft Instant Net with Hitting Target for Practice Bundle, Style Number: MX397" ("*Maxfli 8x8 Instant Net*").

5.

A complete and accurate copy of the accompanying product manual for the *Maxfli 8x8 Instant Net* containing product photographs, parts list, assembly instructions, written warnings, and DSG's express Limited Warranty is attached to Plaintiff's Complaint as Exhibit " 1 ."

6.

The design of the *Maxfli 8x8 Instant Net* allows for easy assembly and erection of a frame, to which an eight foot square netting is attached.

7.

The *Maxfli 8x8 Instant Net* is designed to set up in a typical backyard.

8.

The product is designed to allow the golfer to hang a "hitting target", made of fabric and included as part of the product, in front of the eight foot square netting so that golf balls can be safely hit at high speed and at close range at the hitting target.

9.

The *Maxfli 8x8 Instant Net* is erected by affixing the frame to the ground, with the landscaping stakes provided, including an eight foot long, metal ground bar that is one inch square.  At each end of the ground bar, eight foot long tubular

poles attach so as to stick up in the air like the arms of a goal post. The eight foot square golf netting is anchored to the ground along one of its edges, pinned down by the ground bar which was slipped through a nylon sleeve that runs the length of one edge of the netting. The netting pooled along the ground bar can then be pulled up tight, held down by the ground bar, and attached to and hung between the vertical poles at each end of the bar. The hitting target is hung in front of the netting. Two photographs of the *Maxfli 8x8 Instant Net* showing its front and back are attached to Plaintiff's Complaint as Exhibit " 2 ."

10.

The ordinary way to use portable practice hitting nets, including the *Maxfli 8x8 Instant Net,* is for the golfer to stand several feet back from the suspended netting. The golfer then can strike golf balls at high speed at the hitting target with the golfer's club of choice.

11.

The intended and ordinary function of the *Maxfli 8x8 Instant Net* is for the suspended netting to absorb the impact of a high speed golf ball, effectively capturing it, so that the ball drops harmlessly to the ground in front of the net.

12.

A post-injury photograph of Plaintiff in his backyard positioned in front of the *Maxfli 8x8 Instant Net,* still in place since the day of injury*,* is attached to Plaintiff's Complaint as Exhibit " 3 ."

FACTS & CONTENTIONS

13.

On February 24, 2017, at DSG's retail store located at 6440 North Point Parkway, Alpharetta, Georgia 30022 ("Alpharetta store"), Plaintiff and Defendant executed a contract for the sale of a new *Maxfli 8x8 Instant Net*.

14.

Plaintiff has patronized the Alpharetta store for more than ten years.

15.

On February 24, 2017 Plaintiff paid DSG approximately $130.00 in consideration for the *Maxfli 8x8 Instant Net*.

16.

On the day Plaintiff bought the *Maxfli 8x8 Instant Net* at the Alpharetta store it was a new product in a cardboard box which held a zipped, nylon bag with straps, inside of which was the product manual for the *Maxfli 8x8 Instant Net*, an 8x8 foot netting, the disassembled parts of the product's frame, two landscaping

stakes to pin the frame to the ground, an artificial grass hitting mat, a golf-tee for

use with drivers, a nylon fabric "hitting target" with straps to hang it up in front of

the netting, and a plastic ball dispenser, that provides for a quick delivery to the

golfer of the next ball up.

17.

In partial consideration for payment DSG provided to Plaintiff an express,

new product, limited warranty covering the *Maxfli 8x8 Instant Net.* (*See*: Exhibit

"1," pg. 6).

18.

With regard to the retail sale of the *Maxfli 8x8 Instant Net*, there is privity of

contract between Plaintiff and DSG.

19.

Plaintiff occasionally used the portable practice net in his backyard, usually

in the Spring, for the sole purpose of improving his golf skills.  It was Plaintiff's

routine, that after leaving the *Maxfli 8x8 Instant Net* up for a week or so in good

weather, Plaintiff would take it down and pack it away in his house to protect it

from the elements.

20.

Mr. Macris was seriously and permanently injured by the *Maxfli 8x8 Instant Net* on March 28, 2022 when he hit a golf ball that ricocheted directly back off the frame's square, metal ground bar and struck him at high speed in his left eye. Plaintiff used a 4-iron with a full stroke that drove the ball at high speed directly into the ground bar of the *Maxfli 8x8 Instant Net*.  Plaintiff's typical experience with a 4-iron is around 200 yards with a full stroke.  On this day, the ball ricocheted directly off the square, metal frame, which was staked to the ground, back into Plaintiff's left eye with such high speed that Plaintiff had no time to move, either to duck or block the ball with his hand.  The pain was immediate and severe; Plaintiff's knees buckled and he struggled to maintain consciousness.

21.

Plaintiff was treated immediately following the incident in the emergency department of a local hospital, and since then he has been under the frequent and regular care of ophthalmologists and optometrists who have different medical/surgical specialties.  The left eye injury caused Mr. Macris to develop advanced cataracts, glaucoma, and a fixed and dilated pupil.  Visual acuity in the left eye was significantly degraded.  To prevent the intra-ocular pressure caused by glaucoma from developing to blindness in the left eye, Mr. Macris administers eye

medication twice daily which requires him to lie down, each time for five minutes, and allow the drug to safely migrate into the eye.  The permanently dilated pupil floods the eye with light which requires regular unpleasant adjustments as light changes, particularly when going outdoors.  It is difficult to hold open the left eye outside without effective sunglasses.  After disappointing attempts at conservative management to try and restore visual acuity and lessen photophobia, Mr. Macris, on January 11, 2024 at Emory University Hospital, underwent complex left eye surgery to try to improve eye function and restore eye anatomy, both of which were permanently damaged in the incident.  More particularly the surgery was CPT Code 66982 - Complex phacoemulsification with posterior chamber introcular lens (PCIOL) OS with use of capsular tension ring; CPT Code 67005 - PR RMVL Vitreous Ant Appr Partial Removal; CPT Code 66680 - PR Repair Iris Ciliary Body; Lens implanted: CCAOTO 14.0 D.  The surgery was less than successful; Mr. Macris's treatment continues.  Plaintiff has daily pain in his eye and frequent headaches behind the left eye.  Plaintiff experiences a kaleidoscope like pattern of bright light colors in his left visual field when placing eye drops that can persist for some period following the medication.  To avoid complete loss of sight in the left eye and to improve his ability to function in daily activity, Mr. Macris will require

frequent and complex eye care and accommodation for the rest of his life.  Mr. Macris continues to suffer from facial disfigurement and embarrassment.

22.

Mr. Macris's work has suffered, and will continue to suffer, because he can no longer perform precision tasks required in his business, such as pipetting pharmaceutical compounds, which depend on stereoscopic visual skill, and because daily treatment, pain, eye fatigue and/or headaches have significantly reduced his productive computer/screen time, driving time, and Mr. Macris's physical ability for business development and client services.

23.

Mr. Macris has incurred, and will continue to incur, medical/surgical expenses as a result of the injuries he sustained in the incident.  Plaintiff's injury has caused partial but permanent loss of his ability and capacity to work and to play.  Plaintiff has lost income and will continue to lose income as a result of the incident.  He is 45 years old.

24.

A mishit golf ball that travels at high speed very close to, but parallel with, the ground is commonly known as a "worm-burner."

25.

Before his eye injury, during the approximate five years Plaintiff owned and used the *Maxfli 8x8 Instant Net,* there were three to five instances that a golf ball deflected off the ground bar.  Each time, the ball went into the netting and fell harmlessly to the ground.  These experiences did not cause Plaintiff to think a ball could ricochet directly back at him.

26.

The *Maxfli 8x8 Instant Net* has two structural, latent product design defects that independently rendered it, when sold by DSG to Plaintiff, unreasonably dangerous because of its substantial risk of serious personal injury, unmerchantable, and not fit for the ordinary purpose for which such goods are used because, when used for its ordinary purpose, the product can cause a golf ball to unexpectedly rebound at high speed directly back at the golfer after ricocheting off the product's square, metal ground bar with sufficient force to cause serious personal injury.

27.

The first structural, latent product design defect in the *Maxfli 8x8 Instant Net* is the use of square metal stock, rather than tubular metal stock, to construct the ground bar of the product's frame.  The right angles of the frame made by the one

inch square bar present a flat metal surface to the golfer, increasing the likelihood that the golf ball will unexpectedly ricochet directly back at the golfer when low shots strike the frame.

28.

If the ground bar is tubular, rather than square, the risk of ball ricochet directly back at the golfer is reduced.

29.

The second structural, latent product design defect in the *Maxfli 8x8 Instant Net* is the failure to establish the netting sufficiently forward to stop the golf ball before it reaches the ground bar.  The failure to place the netting between the ground bar and the golfer allows a mishit low ball, or worm burner, to hit the ground bar first, at undiminished speed, and ricochet back at the golfer.

30.

The *Maxfli 8x8 Instant Net* had a third, latent product design defect (marketing/packaging defect) when sold by DSG to Plaintiff that rendered it unreasonably dangerous because of its substantial risk of serious personal injury, unmerchantable, and not fit for the ordinary purpose for which such goods are used because there was a complete absence of product warning about the substantial risk

of eye injury from ball ricochet off the product's square, metal frame, and because there was no instruction to wear safety glasses while hitting into the net.

31.

The *Maxfli 8x8 Instant Net* does not, in its product manual (Exhibit "1") or elsewhere, warn the golfer that a golf ball hit at the practice net may unexpectedly ricochet back at the golfer and cause eye injury.

32.

The *Maxfli 8x8 Instant Net* does not, in its product manual (Exhibit "1") or elsewhere, instruct the golfer to wear safety glasses when using the product to protect against eye injury from ball ricochet.

33.

The *Maxfli 8x8 Instant Net* does not, in its product manual (Exhibit "1") or elsewhere printed on the product, use or include the three phrases: "*ricochet hazard,*" "*golf balls may rebound unexpectedly off frame,*" or "*safety glasses.*"

34.

The design of the base (ground bar and perpendicular legs) of the *Maxfli 8x8 Instant Net* places the product's weight at the end of each leg by arching the center of the ground bar and by arching the center of each leg.  These design elements are visible when the base is placed on a flat surface, and can be seen in the photograph

attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 4 ."  Unfortunately, because the design of the base raises the ground bar in the center of the golf ball's expected path, the ricochet risk in the midline of the net is highest.  Attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 5 " are two photographs. One indicates the metal ground bar is one inch square, and the other photograph shows that the upward arch in the middle of the ground bar raises the bar another 3/4 inch higher into the golf ball's expected path.

35.

The metal ground bar of the *Maxfli 8x8 Instant Net* is, by design, covered in fabric, thereby disguising and hiding the bar's square shape and its flat metal surface facing the golfer.  Also hidden from view is the center arch of the ground bar which raises the ricochet hazard into the ball's path.  Because the ground bar is hidden from the golfer once it is threaded through the sleeve along the netting's edge, the design further contributes to the latency of the ricochet defect.  A photograph of the *Maxfli 8x8 Instant Net* with the ground bar temporarily separated so it can be threaded through the nylon sleeve along one edge of the netting is attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 6 ."

36.

DSG sold the *Maxfli 8x8 Instant Net* in its stores and online.

37.

DSG demonstrated a safer and cost effective portable practice hitting net could have been designed, manufactured, and sold for a profit by DSG to Plaintiff on February 24, 2017 when DSG introduced for sale the "Maxfli Performance Series 9'x8' Practice Net," ("*Maxfli 9x8 Practice Net*").

38.

The sale of *Maxfli 9x8 Practice Nets* has been profitable for DSG.  Adjusted for inflation, both the wholesale and retail prices of the *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* are comparable.

39.

DSG sells the *Maxfli 9x8 Practice Net* in its stores and online.

40.

The design of the *Maxfli 9x8 Practice Net* allows for easy assembly and erection of a frame, to which a nine foot by eight foot netting is attached.

41.

The *Maxfli 9x8 Practice Net* is designed to set up in a typical backyard.

42.

The *Maxfli 9x8 Practice Net* is designed to allow the golfer to hang the hitting target, included, in front of the nine foot by eight foot netting so that golf balls can be safely hit at high speed and at close range at the hitting target.

43.

The *Maxfli 9x8 Practice Net* is erected by affixing to the ground, with the landscaping stakes provided, an eight foot long metal bar that is tubular with a one inch diameter.  At each end of the ground bar, nine foot long tubular poles attach so as to stick up straight in the air like the arms of a goal post.  A nine foot by eight foot golf net is attached to and hung between these two arms.  The hitting target is hung in front of the netting.

44.

The ordinary way to use the *Maxfli 9x8 Practice Net* is for the golfer to stand several feet back from the suspended netting. The golfer then can strike golf balls at high speed at the hitting target with the golfer's club of choice.

45.

The intended and ordinary function of the *Maxfli 9x8 Practice Net* is for the suspended netting to absorb the impact of a high speed golf ball, effectively capturing it, so that the ball drops harmlessly to the ground in front of the net.

46.

The *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* have the same

ordinary purpose.

47.

The *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* were sold by

DSG to be used for the same ordinary purpose.

48.

The *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* were designed

and manufactured by the same company.

49.

After Plaintiff purchased the *Maxfli 8x8 Instant Net* from DSG, DSG

stopped selling the *Maxfli 8x8 Instant Net*.

50.

After DSG stopped selling the *Maxfli 8x8 Instant Net,* it sold the *Maxfli 9x8

Practice Net.*

51.

DSG first began selling the *Maxfli 9x8 Practice Net* in 2018 or 2019.

52.

The *Maxfli 9x8 Practice Net* is a successor product to the *Maxfli 8x8 Instant Net*.

53.

A photograph of the two *Maxfli* portable practice hitting nets sitting side-by-side is attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 7 ."  The upturned clay pot under the forward edge of the netting on the *Maxfli 9x8 Practice Net* demonstrates that, unlike the *Maxfli 8x8 Instant Net*, there is no metal bar concealed inside the netting's leading edge; the golf ball meets stretched fabric first.  *See* photograph of the *Maxfli 9x8 Practice Net* with one side of the leading edge of the netting released from the frame base, attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 8 ."

54.

The *Maxfli 9x8 Practice Net* uses tubular metal stock for its frame's ground bar, eliminating right angles and the presentation of a flat metal surface to the golfer, thereby making ball ricochet directly back at the golfer less likely than with the *Maxfli 8x8 Instant Net*.  A close photograph comparing the metal bases of the *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* is attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 9 ."

55.

The failure of the *Maxfli 8x8 Instant Net*'s design to use tubular metal stock for its frame's ground bar eliminated the dampening effect and ball control expected from the product by Plaintiff.  The failure to use a tubular ground bar in the *Maxfli 8x8 Instant Net* creates a substantial risk of serious personal injury and makes the product unreasonably dangerous when used for its ordinary purpose.

56.

The *Maxfli 9x8 Practice Net* uses "Elastic Cord Connectors" (*e.g.* bungee cords) to extend the netting forward of the frame's ground bar so the ball hits the netting before reaching the bar.  Ball contact with the metal frame in the *Maxfli 9x8 Practice Net*, and therefore ball ricochet, is less likely than with the *Maxfli 8x8 Instant Net*.  A photograph of the bungee cord suspending the netting of the *Maxfli 9x8 Practice Net* in front of the ground bar is attached to Plaintiff's Complaint as Exhibit " 10 ."  The netting of the *Maxfli 9x8 Practice Net* can be suspended forward of its ground bar because, unlike the design of the base of the *Maxfli 8x8 Instant Net*, the ground bar of the *Maxfli 9x8 Practice Net* is located at the rear of the frame's base, behind the netting.  *See* an overhead photograph of the two base frames sitting side-by-side, attached to Plaintiff's Complaint as Exhibit " 11 ."

57.

The failure of design in the *Maxfli 8x8 Instant Net* to suspend the netting in front of the ground bar allowed Plaintiff's mishit low ball to strike the square metal frame first, before reaching the netting, which eliminated the dampening effect and ball control expected by Plaintiff from the *Maxfli 8x8 Instant Net*. The failure of the netting to protect the square, metal ground bar from a high speed golf ball creates a substantial risk of serious personal injury and makes the product unreasonably dangerous when used for its ordinary purpose.

58.

The product manual accompanying the newer model *Maxfli 9x8 Practice Net* warns of a ricochet hazard from golf balls rebounding unexpectedly off the frame, as well as instructs the golfer to wear safety glasses while practicing to protect against eye injury.

59.

The product manual of the *Maxfli 9x8 Practice Net* uses and includes the phrases: "*ricochet hazard*," "*golf balls may rebound unexpectedly off frame*," and "*safety glasses*."

60.

A complete and accurate copy of the accompanying product manual for the *Maxfli 9x8 Practice Net* is attached to Plaintiff's Complaint as Exhibit " 12 ."

61.

The failure of design in the *Maxfli 8x8 Instant Net* to warn (marketing/packaging defect) of a ricochet hazard from golf balls rebounding unexpectedly off the frame, as well as its failure to instruct the golfer to wear safety glasses while practicing to protect against eye injury, caused Plaintiff to misapprehend his high risk of serious eye injury while driving balls at close range into the product, and the failure to warn of the ricochet hazard was the reason he did not protect himself by wearing safety glasses.  The failure of the *Maxfli 8x8 Instant Net* to warn of a ricochet hazard from golf balls rebounding unexpectedly off the frame, as well as its failure to instruct the golfer to wear safety glasses while practicing to protect against eye injury, creates a latent and substantial risk of serious personal injury and makes the product unreasonably dangerous when used for its ordinary purpose.

62.

The use of: (*i*) tubular stock for the metal ground bar of the product's frame; (*ii*) bungee cords to suspend the net forward so the ball contacts the netting before

it reaches the ground bar; and (*iii*) a product warning to wear safety glasses in order to protect against an eye injury from unexpected ball ricochet off the frame are design elements intended to protect against an eye injury like the one suffered by Plaintiff.

63.

The use of: (*i*) tubular stock for the metal ground bar of the product's frame; (*ii*) bungee cords to suspend the net forward so the ball contacts the netting before it reaches the ground bar; and (*iii*) a product warning to wear safety glasses in order to protect against an eye injury from unexpected ball ricochet off the frame are design elements that were cost effective and technologically feasible to incorporate into the *Maxfli 8x8 Instant Net* at the time it was sold to Plaintiff on February 24, 2017.

64.

The defects of the *Maxfli 8x8 Instant Net*: (*i*) the failure to warn of the risk of eye injury from ball ricochet and the need for safety glasses, (*ii*) the failure to use a tubular ground bar, and (*iii*) the failure to position the netting between the ground bar and golfer, are latent product design defects.

65.

On March 28, 2022, if Plaintiff had hit the same low ball that ricocheted

back into his left eye, but instead was wearing safety glasses and was practicing

with the *Maxfli 9x8 Practice Net*, and not the *Maxfli 8x8 Instant Net,* he likely

would not have suffered an eye injury.

66.

The *Maxfli 8x8 Instant Net* is a defective product because, when used for its

ordinary purpose, it has a hidden and substantial risk of serious eye injury from

unexpected high speed ball ricochet back at the golfer, and because the product

does not warn about the risk of ricochet and instruct the golfer to wear safety

glasses while hitting into the net to protect against eye injury.

67.

At the time of sale to Plaintiff, the *Maxfli 8x8 Instant Net* was defectively

designed, unreasonably dangerous, and not fit for the ordinary purpose for which

such goods are used because the substantial risk  of serious personal injury during

ordinary use of the product, an eye injury from ball ricochet, outweighs the

product's utility, a practice aid for amateur golfers.

68.

DSG received written notice in September 2022 of Plaintiff's contention that

the *Maxfli 8x8 Instant Net* purchased by Plaintiff from DSG had caused him to

suffer a serious eye injury because the product was defectively designed when sold

to him by DSG.

69.

A complete and accurate copy of Plaintiff's counsel's September 15, 2022

letter to Ms. Lauren Hobart, CEO, Dick's Sporting Goods, Inc., is attached to

Plaintiff's Complaint as Exhibit " 13 ."

70.

Before using the *Maxfli 8x8 Instant Net*, Plaintiff read the product manual,

and at all times, observed the written warnings given, followed the product's

instructions, and respected limitations set out in DSG's written warranty for the

assembly, care and use of the product.

71.

Plaintiff has performed all conditions precedent necessary to bring a civil

action against DSG for personal injury damages Plaintiff suffered, and will

continue to suffer, which were and are proximately caused by the *Maxfli 8x8*

*Instant Net's* latent product design defects, both structural and packaging/labeling

in nature, which rendered it, at the time of sale, defective and unmerchantable because of its inherent, unreasonable and substantial risk of serious personal injury when used for its ordinary purpose of hitting golf balls hard at it.

<u>COUNT I</u>:
<u>Implied Warranty of Merchantability</u>

72.

All preceding statements and allegations contained in Plaintiff's Complaint are incorporated by reference.

73.

Under Georgia law, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a retail contract for their sale if the seller is a merchant with respect to goods of that kind.

74.

Goods to be merchantable must be at least such as are fit for the ordinary purpose for which such goods are used.

75.

DSG is a "*merchant*," within the meaning of O.C.G.A. § 11-2-314, with respect to portable practice hitting nets, like the *Maxfli 8x8 Instant Net*, and goods of that kind.

76.

The *Maxfli 8x8 Instant Net* is a product within the category of "*consumer goods*" as that term is used in O.C.G.A. § 11-2-719(3).

77.

In the sales transaction between the parties, Plaintiff's purchase of the *Maxfli 8x8 Instant Net* from DSG, the product was subject to the implied warranty of merchantability which places a duty on DSG toward Plaintiff that the product be fit to use for its ordinary purpose.

78.

The ordinary purpose of the *Maxfli 8x8 Instant Net* is for its netting to absorb the impact of a high speed golf ball so that the ball drops harmlessly to the ground in front of the net.  It is contrary to the ordinary purpose of the *Maxfli 8x8 Instant Net* for the ball to ricochet off the product at high speed back at the golfer.

79.

On March 28, 2022, while Plaintiff was using the *Maxfli 8x8 Instant Net* as intended and for its ordinary purpose, the product did not absorb the impact of a ball Plaintiff hit hard into the product, but instead, shot the ball back into his left eye at high speed.  Plaintiff purchased the net because it is unreasonably dangerous to hit a golf ball at high speed unless the ball has a safe path to a resting place on

the ground.  The ordinary purpose of a portable practice hitting net is to provide a safe, short path to the ball's resting place.  Plaintiff was hurt because the design of the *Maxfli 8x8 Instant Net* places a hidden, square, metal obstacle in front of the netting and fails to warn of the substantial risk of eye injury from ball ricochet  and the need for safety glasses.

80.

The *Maxfli 8x8 Instant Net* was unfit for its ordinary purpose and unreasonably dangerous when sold to Plaintiff because a high speed ball can unexpectedly ricochet back off the product and cause eye injury, and because there is no product warning about the substantial risk of serious personal injury and the need for safety glasses.

81.

No reasonable person, including Plaintiff, who understood the risk of eye injury connected to practicing with the *Maxfli 8x8 Instant Net* would use the product without wearing safety glasses.

82.

DSG breached the implied warranty of merchantability when it sold the *Maxfli 8x8 Instant Net* to Plaintiff because, at the time of sale, the product had defects that created an unreasonably high risk of serious eye injury when the

product was put to its ordinary use, and because Plaintiff was given no warning about ball ricochet and no instruction to wear safety glasses. The *Maxfli 8x8 Instant Net*, when purchased by Plaintiff, was not fit for the ordinary purpose for which such goods are used.

83.

DSG's breach of the implied warranty of merchantability was the proximate cause of the personal injury and damages suffered by Plaintiff in the incident and, therefore, DSG is responsible to Plaintiff for all of the injuries and damages Plaintiff suffered, and will continue to suffer, as a result of the incident.

COUNT III:
Negligence

84.

All preceding statements and allegations contained in Plaintiff's Complaint are incorporated by reference.

85.

With the intention that Plaintiff view DSG as more than a golf product retailer, and rely on DSG's representation that its private brand products are safe, DSG has, at all relevant times, promoted itself in the image of an athletic products coach, having expertise on the suitability and safety of sport equipment, generally, with emphasis on the company's expertise in privately branded golf practice aids

and, therefore, DSG became, at the time of sale, the *Maxfli 8x8 Instant Net*'s golf-knowledgeable endorser and ostensible-manufacturer by: (*i*) developing a service business in its retail stores employing professionally certified golfers to offer lessons and expert advice to consumers on golf products DSG sells, including portable practice hitting nets; (*ii*) providing and promoting a manufacturing-like ability to alter and fit golf products to the individual; (*iii*) developing small spaces within its stores where golf balls are safely hit ("Hitting Bays") at high speeds, without ricochet, by inexperienced golfers; (*iv*) marketing *Maxfli* as a private and superior brand of golf practice aids and making those products available for retail sale exclusively through DSG; (*v*) packaging, labeling, and branding the *Maxfli 8x8 Instant Net* as a DSG product; and  (*vi*) by providing a written, manufacturer's warranty to Plaintiff with a promise that "Dick's Sporting Goods, Inc." will repair or replace a defective *Maxfli 8x8 Instant Net*.

86.

At the time of sale DSG assumed a continuing duty of care to warn Plaintiff to wear safety glasses while using the *Maxfli 8x8 Instant Net* because, as an inducement to sale, DSG held itself out to Plaintiff as an expert in all things golf, but specifically expert in controlling risks connected with hitting high speed golf balls in close spaces, and also because DSG promoted its exclusive *Maxfli 8x8*

*Instant Net* as a DSG created product, quality tested by DSG for product safety.

87.

At all relevant times, DSG represented to its golf product consumers, including Plaintiff, that the company's quality control and testing of private brand golf products and DSG's expertise in evaluating golf equipment informed DSG's decision to offer the *Maxfli 8x8 Instant Net* for sale.

88.

Defendant promotes itself in its notices to customers and on its website as competent to give  advice and direction to customers on the individual selection of golf equipment, including portable practice hitting nets.

89.

Plaintiff was reasonable in his reliance on DSG's substantial investment in, and promotion of, the company's extensive golf product expertise in deciding to purchase a portable practice hitting net from DSG.  Portable practice hitting nets are specialty retail items that have limited availability.

90.

When Plaintiff purchased the *Maxfli 8x8 Instant Net,* Plaintiff reasonably relied, to Plaintiff's detriment, on DSG's promotion of itself as a golf equipment expert, as well as relied on Plaintiff's personal experience with the array, quantity,

and quality of golf products and professional golf services available at the

Alpharetta store, that the *Maxfli 8x8 Instant Net* would be functional, durable, and

safe to use.

91.

The brand name, *Maxfli*, is conspicuously printed on the carry bag of the

*Maxfli 8x8 Instant Net*.

92.

A representative photograph of the two *Maxfli* portable practice hitting net

carry bags, side-by-side, is attached to Plaintiff's Complaint as Exhibit " 14 ."

93.

The *Maxfli 8x8 Instant Net* was designed and manufactured to be sold as a

new retail product exclusively through DSG and/or through companies controlled

by and/or affiliated with DSG.

94.

The *Maxfli 8x8 Instant Net* was sold as a new retail product exclusively

through DSG and/or through companies controlled by and/or affiliated with DSG.

95.

Other golf related products, such as bags, balls, tees, and golf apparel are branded *Maxfli* by DSG and sold at retail exclusively by DSG, including at the Alpharetta store, and/or by companies controlled by and/or affiliated with DSG.

96.

DSG owns and controls the intellectual property rights connected to the product brand, *Maxfli*

97.

DSG contributed and provided images and language that were included in the product manual of the *Maxfli 8x8 Instant Net*.

98.

Included in the product manual of the *Maxfli 8x8 Instant Net* are: (*i*) DSG's trademarked logo; (*ii*) the company slogan: "*Every Season Starts at Dick's Sporting Goods*;" (*iii*) language creating and defining the scope of the limited warranty given by DSG to Plaintiff: "*Dick's Sporting Goods, Inc. (The 'Company') warrants this product to be free from defects in workmanship and materials under normal use and conditions for a period of one year from the date of original purchase ... The Company's obligation under this warranty is limited to replacing or repairing the Product, at the discretion of the company.*;" and (*iv*) DSG's

business address, telephone number, and email address with a direction to the

consumer: "*Please direct all Product inquiries to Dick's Sporting Goods, Inc.*"

(*See*: Exhibit "1," pg. 6).

99.

There is no other company, entity or individual, besides DSG, identified or

indicated within the product manual of the *Maxfli 8x8 Instant Net* or otherwise

identified or indicated on the product itself.

100.

DSG controlled all attributes and placement of corporate identity on the

*Maxfli 8x8 Instant Net*,  and in its accompanying product manual.

101.

DSG controlled the placement of, including whether to place, logos, labels,

or text on the *Maxfli 8x8 Instant Net*, and in its accompanying product manual.

102.

DSG controlled all attributes and placement of corporate identity on the

*Maxfli 9x8 Practice Net*, and in its accompanying product manual.

103.

DSG controlled the placement of, including whether to place, logos, labels,

or text on the *Maxfli 9x8 Practice Net*, and in its accompanying product manual.

104.

The *Maxfli 8x8 Instant Net* was designed and/or manufactured according to DSG's specifications and/or according to the specifications of one of DSG's affiliated companies or agents.

105.

DSG controlled the marketing of the *Maxfli 8x8 Instant Net*.

106.

The only information given by DSG in the product manual for the *Maxfli 8x8 Instant Net* about the product's place of origin is: 345 Court Street, Coraopolis, Pennsylvania, DSG's principal corporate address.

107.

DSG created all or part of the product manual for the *Maxfli 8x8 Instant Net*.

108.

DSG created all or part of the product manual for the *Maxfli 9x8 Practice Net*.

109.

The *Maxfli 8x8 Instant Net* sold to Plaintiff is labeled a DSG product.

110.

The *Maxfli 8x8 Instant Net* sold to Plaintiff is labeled a DSG/*Maxfli* product.

111.

The *Maxfli 8x8 Instant Net* sold to Plaintiff is labeled a *Maxfli* product.

112.

It is reasonable to conclude from the product's labeling and the information given in the product manual for the *Maxfli 8x8 Instant Net*, as Plaintiff did so conclude, that DSG is the only company responsible for the product's conception, design, development, manufacture, distribution, and retail sale.

113.

Under the facts and circumstances of the present case, DSG held itself out as the manufacturer of the *Maxfli 8x8 Instant Net*, and is, therefore, the ostensible manufacturer of the *Maxfli 8x8 Instant Net*.   As the ostensible manufacturer of the *Maxfli 8x8 Instant Net*, under Georgia law, DSG had the same continuing duty toward Plaintiff as the actual product manufacturer, that is to exercise reasonable care to seasonably warn Plaintiff if and when DSG received or discovered information that would have lead a reasonable person to conclude the product is unreasonably dangerous because of a latent and substantial risk of serious personal injury and should not be used without eye protection.

114.

At the time of sale to Plaintiff of the *Maxfli 8x8 Instant Net* it was standard practice in the design and manufacture of portable practice hitting nets, that the net's frame cannot present a flat surface to the golfer; instead, it is best industry practice that frame components are tubular because of the shape's characteristic for obtuse deflection of a ball.

115.

DSG knew, or should have known, at the time of sale, from its contributions to and familiarity with the product manual of the *Maxfli 8x8 Instant Net*, which contains photographs of the ground bar, and from its experience with the product, that the ground bar is square, metal stock and is, therefore, presumed unfit and unreasonably dangerous to use in the frame of a portable practice hitting net.

116.

DSG knew, or should have known, at the time of sale, from its contributions to and familiarity with the product manual of the *Maxfli 8x8 Instant Net*, and from its experience with the product, that the product manual contained no warning of ball ricochet and no instruction to wear safety glasses to protect against eye injury.

117.

Through its contributions to, and content control of, the product manual of the *Maxfli 8x8 Instant Net*, DSG assumed a duty to place in the manual an adequate warning that safety glasses should be worn while using the product because of the substantial risk of eye injury from ball ricochet, and failing the placement of an adequate warning in the product manual, DSG's assumption of the duty remained post- sale as a continuing duty to use due care to warn Plaintiff.

118.

DSG's Alpharetta store is a big-box, retail store that offers for sale many brands of golf equipment, golf apparel, golf practice aids, and other golf merchandise.  DSG sells other portable practice hitting nets that do not carry the *Maxfli* brand, or have the name, "Dick's Sporting Goods, Inc.," on the product itself or in the accompanying product manual.

119.

At all relevant times DSG offered for sale, on line and in its retail stores, different models and styles of portable practice hitting nets, including those branded *Maxfli* and the nets supplied by other companies, such as *SKLZ* and *Callaway*.

120.

In 2007, DSG acquired Golf Galaxy, LLC ("Golf Galaxy"), a leading specialty golf retailer, at the time with 65 stores in 24 states, thereby making DSG the largest speciality golf brick-and-mortar retailer in the United States.

121.

In 2017 DSG had more than 600 brick-and-mortar retail stores in the US selling golf equipment, including portable practice hitting nets.

122.

At all relevant times DSG has offered retail consumers throughout the country golf lessons from expert golf instructors employed by DSG.

123.

In holding itself out as a place to come for expert advice in the sport of golf, DSG's website offers: "*The Golf PROS at Dick's Sporting Goods are dedicated to elevating your game.*"

124.

Until 2014 DSG had as many as 400 licensed PGA Professionals employed at one time, and available through its retail stores, to give golf lessons and advice on golf related products sold at DSG.

125.

At its Alpharetta store DSG has a Hitting Bay, which is an enclosed space within the store containing a golf course simulator equipped with technology used to collect and display information related to the flight and trajectory of the consumer's golf ball.  DSG's employees can use the data collected from a  Hitting Bay session to help with golf-related product recommendations and product adjustments.

126.

The ordinary purpose for both the *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* is to develop a golfer's swing by creating a safe space to practice striking golf balls at high speed and at close range at a hitting target.

127.

At all relevant times DSG has used Hitting Bays in some of its stores which were designed and built to, among other things, prevent the escape of a high speed golf ball into the general store area and to prevent a high speed golf ball from ricocheting within a Hitting Bay.

128.

DSG was sued in the case styled: Robert Jesse v. Dick's Sporting Goods, Inc., USDC, Eastern District of Michigan, No: 13-CV-1164; Decided April 2,

2014.  In 2011 the plaintiff in <u>Jesse</u> suffered an eye injury from a ball ricochet in a DSG Hitting Bay.  As reported in the opinion, DSG learned from its golf-pro employee that the ricochet seemed to have been caused by a slight lip on a sensor above the tee pad.

129.

At least since 2011, DSG has trained some of its employees on safety measures intended to reduce the risk of injury from golf ball ricochet inside of a Hitting Bay.

130.

As a condition of use, a consumer must sign a document that acknowledges the consumer's risk of eye injury from ball ricochet before accessing a DSG Hitting Bay.

131.

On information and belief, during the period the *Maxfli 8x8 Instant Net* was offered for sale at DSG's stores, before and after Plaintiff's February 24, 2017 purchase, DSG's employees, at times, assembled the *Maxfli 8x8 Instant Net*, practiced with it, erected it for sales displays in DSG's stores, unpacked customers' returned and damaged *Maxfli 8x8 Instant Net*s to repair and/or replace under the terms of DSG's limited, one year warranty, and received and reviewed consumer's

remarks posted to DSG's website, and otherwise related by consumers, about unpredictable ball ricochet off the frame's of *Maxfli* portable practice hitting nets.

132.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that serious eye injury can occur while using portable practice hitting nets unless care is taken to protect against a ricochet hazard.

133.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that serious eye injury in the sport of golf was an industry concern and was common enough that it was referenced in medical literature by its acronym, "GROI," golf related ocular injury.

134.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that reducing the risk of injury from ball ricochet is fundamental to the safe design of a portable practice hitting net.

135.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that a golfer should wear eye protection when using any portable practice hitting net.

136.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that it was unsafe to use the *Maxfli 8x8 Instant Net* without wearing safety glasses.

137.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that it is common for an amateur male golfer to hit a golf ball at a speed of 130 mph or more.

138.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, Plaintiff would likely stand close when hitting into the *Maxfli 8x8 Instant Net* because the product intends the golfer stand close, and because the closer the golfer, the better chance the ball is caught by the net, instead of sailing dangerously off.  The golfer's expected close position to the net is pictured in the product manual for the *Maxfli 9x8 Practice Net*.  (*See* Exhibit "12," pg. 8).

139.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that if the ball is hit hard and ricochets off the frame

directly back at the golfer, human reaction time is too slow for the golfer to avoid being struck.

### 140.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, Plaintiff was likely an amateur golfer who might hit low, high speed shots, worm burners, at the *Maxfli 8x8 Instant Net*.

### 141.

DSG knew, or should have known, at the time of sale of the *Maxfli 8x8 Instant Net* to Plaintiff, that the substantial risk of golf ball ricochet off the *Maxfli 8x8 Instant Net* directly back at the golfer with sufficient force to cause a serious personal injury would likely be unknown to, and not suspected by, the average consumer/amateur golfer.

### 142.

At all relevant times the only golf product sold by DSG with a risk of eye injury from ball ricochet, apart from the ball and club, themselves, is the portable practice hitting net.

### 143.

At all relevant times DSG assumed a duty to the consumer, and therefore to Plaintiff, to test and inspect its private brand products before retail sale.  DSG has

also assumed a continuing duty to use due care to monitor consumer experience with its private brand products, and to then warn the consumer if DSG's pre-sale evaluation or post-sale consumer feedback reveals a product defect that carries a latent and substantial risk of serious personal injury.  In DSG vernacular, "teammates" are employees, and "athletes" are consumers.   DSG's duty to test and inspect its private brand products is outlined in its 2018 Corporate Social Responsibility Report in the section entitled: "*Team Product Training*" and "*Investing In Private Brands*."  "*Teammates*" (employees) are instructed to "*proactively seek to improve knowledge of products*."  "*Our private brands go through quality testing to ensure functionality, design and performance will meet athletes'* (consumers') *needs.  Furthermore, we are continuously seeking improvement, staying in constant communication with athletes* (consumers) *to gain their feedback and input, and informing enhancements*."  A copy of "*Dick's Sporting Goods 2018 CSR Report*", pgs. 26 & 27,  is attached to Plaintiff's Complaint as ==Exhibit== " 15 ."

144.

At all relevant times DSG assumed a duty to the consumer, and therefore to Plaintiff, to ensure the private brand products it sells, like the *Maxfli 8x8 Instant Net,* are subject to the company's "Private Brand Product Testing" and "Private

Brand Quality Control" to evaluate product safety.  Every DSG employee is responsible to report information that a DSG product might be unsafe to the company's "Product Safety Team."  DSG's stated duty to test private brand products for safety and the responsibility DSG places on employees to recognize and report unsafe products are expressed in "*Dick's Sporting Goods 2022 Code of Ethics and Business Conduct*", pg. 24, attached to Plaintiff's Complaint as <mark>Exhibit</mark> " 16 ."

145.

The *Maxfli 8x8 Instant Net* is not a product that was packed by a reputable and competent manufacturer of portable practice hitting nets and, therefore, a duty arose on the part of DSG toward Plaintiff, at the time of sale to Plaintiff, continuing in nature, to exercise due care to test and inspect the product, and to then warn Plaintiff of the substantial risk of serious eye injury from an unexpected ricochet of the ball off the product's frame and the need for safety glasses.

146.

By expressly warranting to Plaintiff that the *Maxfli 8x8 Instant Net* was free of defects, and by expressly promising, if defective, to provide for its repair or replacement, DSG assumed a continuing duty of due care toward Plaintiff to test and inspect the product, and to then to warn him that the product has a substantial

risk of serious personal injury from ball ricochet and should not be used without safety glasses.

147.

DSG has a business practice of following up on consumer reports received by DSG that a private brand product it sold is unsafe, and then taking action to adequately warn other consumers known to DSG to have also purchased the product.

148.

At all relevant times DSG voluntarily undertook a duty to monitor its private brand products post-sale and to warn consumers, known to DSG to have purchased a particular product, if DSG later learns the product sold has a latent defect that creates a substantial risk of serious personal injury.

149.

Testing and inspection of the *Maxfli 8x8 Instant Net* by an experienced DSG employee ("Teammate"), or by one of DSG's PGA certified employees, would have revealed: (*i*) the increased risk of ball ricochet directly back at the golfer from a square, metal, box frame compared to a tubular frame; (*ii*) the failure to position the netting in front of the ground bar allows the golf ball to strike the bar before reaching the net, increasing the likelihood of ricochet; and (*iii*) the need for an

adequate warning of the substantial risk of serious eye injury from ball ricochet and the need for instruction to wear safety glasses.

150.

Before offering it for sale in its stores DSG had no information that the *Maxfli 8x8 Instant Net* was safe to use as a portable practice hitting net capable of safely controlling and containing high speed golf balls hit into it at close range.

151.

DSG has never considered whether there is a substantial risk of serious personal injury from the ordinary use of any portable practice hitting net it sold.

152.

DSG has never considered whether there is a substantial risk of serious personal injury from the ordinary use of a portable practice hitting net which uses square metal stock as a part of its frame.

153.

DSG has never considered whether there is a substantial risk of serious personal injury from the ordinary use of the *Maxfli 8x8 Instant Net*.

154.

DSG is unable to identify the manufacturer of the *Maxfli 8x8 Instant Net* sold to Plaintiff.

155.

The *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* were not manufactured by the same company.

156.

The *Maxfli 8x8 Instant Net* and the *Maxfli 9x8 Practice Net* were not designed by the same company.

157.

DSG has not, after it stopped selling the *Maxfli 8x8 Instant Net*, offered for sale any other portable practice hitting net that was manufactured by the same company that manufactured the *Maxfli 8x8 Instant Net* sold to Plaintiff.

158.

DSG stopped selling the *Maxfli 8x8 Instant Net* because it is an unsafe product.

159.

When used for their ordinary purposes, the *Maxfli 8x8 Instant Net* is more likely to cause an eye injury than is the *Maxfli 9x8 Practice Net*.

160.

The design defects of the *Maxfli 8x8 Instant Net* are, in the exercise of the care, skill, and experience of dealers in such products, generally, discoverable, and

as such created a continuing duty of due care on the part of DSG, at the time of sale

and thereafter, to warn Plaintiff of the unreasonable and substantial risk of serious

eye injury from an unexpected ricochet of the ball off the product's frame and the

need for safety glasses when using the product.

161.

DSG acted negligently when, after learning the *Maxfli 8x8 Instant Net* has a

latent defect that creates a substantial risk of serious personal injury, it failed to

exercise due care to send Plaintiff an email and/or a letter by regular mail, or

otherwise providing notice, warning him of the substantial risk of eye injury and

the need for safety glasses when using the product.

162.

The substantial risk of golf ball ricochet off the *Maxfli 8x8 Instant Net*

directly back at the golfer with sufficient force to cause a serious personal injury

was unknown to, and not suspected by, Plaintiff before his eye injury.

163.

If Plaintiff had been informed by DSG, or otherwise learned, of the

unreasonable risk of serious eye injury from ball ricochet and the need for safety

glasses, Plaintiff would have immediately, and all together, stopped using the

*Maxfli 8x8 Instant Net* because eye protection does not protect other areas of the head, face or body from ricochet injury.

164.

Before March 28, 2022, DSG knew, or had reason to know, the *Maxfli 8x8 Instant Net* was defective when used for its ordinary purpose because there was no product warning that it has a hidden and substantial potential for serious eye injury.

165.

DSG has never warned anyone that the *Maxfli 8x8 Instant Net* may cause an eye injury if used without safety glasses.

166.

DSG did not warn Plaintiff when he bought the *Maxfli 8x8 Instant Net*, nor thereafter, that it is unsafe to use without safety glasses.

167.

DSG breached the duty of care it owed Plaintiff when it negligently sold Plaintiff a portable practice hitting net that did not incorporate available technology which was economically feasible at the time of sale, where the sale of such an alternatively designed product would have prevented, or substantially reduced the likelihood of, Plaintiff's injuries.

168.

Georgia law places a continuing duty to warn on retailers, like DSG, if, at the time of sale, the retailer knew, or should have known, that the product sold contains a latent defect that creates an unreasonable and substantial risk of serious personal injury. DSG had a continuing duty to warn Plaintiff to wear safety glasses, which duty began on the date of sale, because DSG knew then, or should have known, that the ordinary use of the *Maxfli 8x8 Instant Net* subjected Plaintiff to an unreasonable and substantial risk of eye injury, and that the *Maxfli 8x8 Instant Net* had no product warning about the ricochet defect and need for safety glasses when using the product.

169.

After receiving actual and/or constructive notice of the product's latent, unreasonable and substantial risk of serious personal injury, DSG breached, and failed to meet, its continuing duty of due care it had toward Plaintiff by negligently and continually failing to warn Plaintiff of the risk of eye injury from the unexpected ricochet of the ball off the product's concealed ground bar and the corresponding need to wear safety glasses.

170.

DSG's negligent failure to test and inspect its private brand product, the *Maxfli 8x8 Instant Net*, and discover its defects, resulting in the negligent sale to Plaintiff of an unreasonably dangerous product, and DSG's negligent failure to meet its continuing duty to Plaintiff to warn him of the latent, substantial risk of eye injury and the need for safety glasses, after actual and/or constructive notice to the company of the ricochet defect, were the proximate causes of the personal injury and damages sustained by Plaintiff in the incident and, therefore, DSG is responsible to Plaintiff for all of the injuries and damages Plaintiff suffered, and will continue to suffer, as a result of the incident.

<u>COUNT III</u>:
<u>Punitive Damages</u>

171.

All preceding statements and allegations contained in Plaintiff's Complaint are incorporated by reference.

172.

For years, DSG acted with an entire want of care that raises the presumption of conscious indifference to the harmful consequences Plaintiff would suffer because DSG repeatedly failed to use its reliable, regular and established methods of communicating with Plaintiff, by email or regular mail, to warn him of the

substantial risk of eye injury, well known to DSG, inherent in the ordinary use of the *Maxfli 8x8 Instant Net* without eye protection.

173.

When DSG offered the *Maxfli 8x8 Instant Net* for sale, DSG decided to include in the product manual: (*i*) DSG's name; (*ii*) DSG's corporate slogan; (*iii*) DSG's corporate logo; (*iv*) DSG's Limited Warranty; and (*v*) DSG's contact information for consumer inquiry.  DSG included in the product manual that the *Maxfli 8x8 Instant Net* was distributed by Dick's Sporting Goods, Inc.

174.

When DSG offered the *Maxfli 9x8 Practice Net* for sale, DSG decided <u>not</u> include in the product manual: (*i*) DSG's name; (*ii*) DSG's corporate slogan; (*iii*) DSG's corporate logo; (*iv*) DSG's Limited Warranty; nor (*v*) DSG's contact information for consumer inquiry.  DSG included in the product manual that the *Maxfli 9x8 Practice Net* is distributed by ASL, LLC.

175.

ASL, LLC, the distributor of the *Maxfli 9x8 Practice Net*, Dick's Sporting Goods, Inc., the former distributor of the *Maxfli 8x8 Instant Net*, and Golf Galaxy, LLC, a retail golf equipment and service company, all have the same principal business address, 345 Court Street, Coraopolis, Pennsylvania 15108.

176.

ASL, LLC, Dick's Sporting Goods, Inc., and Golf Galaxy, LLC are affiliated businesses.

177.

To help shield DSG from the potential liability of personal injury product claims, DSG decided not to identify itself in the product manual of the *Maxfli 9x8 Practice Net*.

178.

The product manual of the *Maxfli 9x8 Practice Net* is dated 2019.

179.

DSG knew, or should have known, at least by 2019, that the product manual for the *Maxfli 9x8 Practice Net* warns of the risk of eye injury from ball ricochet and the need for safety glasses, but that the product manual for the *Maxfli 8x8 Instant Net* did not warn of the risk of eye injury from ball ricochet, nor the need for safety glasses.

180.

In 2019, DSG knew, or had reason to know, the *Maxfli 8x8 Instant Net* was defective when used for its ordinary purpose because it has a substantial risk for

serious eye injury that would likely not be appreciated or understood by an amateur golfer.

181.

Before Plaintiff was hurt by the *Maxfli 8x8 Instant Net*, several consumers posted reviews on DSG's website relating their experiences about unexpected ball ricochet off the frames of *Maxfli* portable practice hitting nets. A representative example of a review about the ricochet hazard posted before Plaintiff's eye injury reads, in part:

> "*Maxfli engineers are a joke. Whoever decided to add a giant metal beam to the bottom of the net is insane. Makes balls ricochet right off the bottom beam directly back into you or the house ... Stay away from this company.*"

182.

A complete and accurate copy of three customer reviews discussing the risk of ricochet from Maxfli's portable practice hitting nets are attached to Plaintiff's Complaint as Exhibit " 17 ." The first review (P17 – 1/3) is from DSG's website and the other two (P17 – 2/3, 3/3) are from its mobile app.

183.

At the time Plaintiff purchased his *Maxfli 8x8 Instant Net* from DSG's Alpharetta store on February 24, 2017, or soon thereafter, DSG had information

from consumers, affiliate businesses, its own golf professionals and/or its sales staff that the product carried a substantial risk of serious personal injury with ordinary use because of unpredictable ball ricochet back at the golfer, and that the product failed to warn about the need for eye protection while hitting into the net.

184.

At the time DSG sold a *Maxfli 8x8 Instant Net* to Plaintiff, or soon thereafter, concerns about ricochet from using *Maxfli* portable practice hitting nets had already caused an undertaking, known to DSG, to obtain an alternately designed portable practice hitting net that would reduce the likelihood of ricochet back at the golfer.

185.

Between Plaintiff's purchase of the *Maxfli 8x8 Instant Net* on February 24, 2017, and the day of Plaintiff's injury, March 28, 2022, DSG had received more than five consumer product reviews posted to its website that *Maxfli* portable practice hitting nets were unsafe because of the ricochet defect.

186.

To further its marketing and improve sales, DSG offers its customers a "Scorecard Number" if the customer provides personal contact information to DSG.

187.

A consequence of receiving a Scorecard Number, and becoming a Scorecard Member, is regular communications from DSG through emails about new products, product discounts, and/or store events and services.

188.

Plaintiff agreed to become a Scorecard Member, provided his personal contact information to DSG, and was assigned a Scorecard Number by DSG, which was used to track purchases he made at the Alpharetta store before Plaintiff bought the *Maxfli 8x8 Instant Net*.

189.

The information DSG collects about Plaintiff's merchandise preferences helps DSG target email product advertisements to Plaintiff.

190.

DSG sent Plaintiff email advertisements each year of the five year period from January 1, 2017 through December 31, 2021.

191.

In 2023, using Plaintiff's Scorecard Number, DSG determined that Plaintiff purchased the *Maxfli 8x8 Instant Net* from DSG on February 24, 2017.

192.

Despite– (*i*) DSG's advertised expertise in golf products and equipment,
upon which Plaintiff relied; (*ii*) its stated policy to test, for safety before sale, the
company's private brands, like *Maxfli*; (*iii*) the substantial risk of serious personal
injury from the type of latent defect in the *Maxfli 8x8 Instant Net*; (*iv*) the known
and documented risk of ocular injury ("GROI") in the sport of golf; (*v*) customer
reviews posted on DSG's website prior to Plaintiff's eye injury which put DSG on
notice of the ricochet defect in *Maxfli* portable practice hitting nets; (*vi*) DSG's
substitution of the *Maxfli 8x8 Instant Net* for the *Maxfli 9x8 Practice Net* because
of the safer design of the *Maxfli 9x8 Practice Net*; (*vii*) that, even after the alternate
and safer design, the *Maxfli 9x8 Practice Net* still requires a warning that eye
injury is a risk of ordinary use; (*viii*) DSG's knowledge through its own
contributions to the two product manuals that the *Maxfli 8x8 Instant Net*, unlike the
*Maxfli 9x8 Practice Net*, contained no warning of, or even reference to, the
substantial risk of eye injury from golf ball ricochet; (*ix*) DSG's specific,
developed expertise in golf ball ricochet, how dangerous it is, and how to guard
against it in small spaces like in the company's Hitting Bays; (*x*) DSG's own
experience and litigation because of a customer's serious eye injury from golf ball
ricochet; (*xi*) DSG's knowledge, at the time the *Maxfli 8x8 Instant Net* was

available for retail sale, that the product would use a one inch square, metal ground bar to display a hitting target; (*xii*) DSG maintaining regular contact with Plaintiff through his Scorecard Number and regularly, for years, emailing him solicitations about its other products and services; (*xiii*) DSG knowing, through Plaintiff's Scorecard Number, that Plaintiff bought a *Maxfli 8x8 Instant Net* from Defendant on February 24, 2017; and (*xiv*) DSG knowing, at the time of sale to Plaintiff, that the *Maxfli 8x8 Instant Net* would be purchased by amateur golfers often hit bad shots, hard – DSG decided it important to remove its name from the product manual of *Maxfli* portable practice hitting nets because they are too dangerous, and decided it was not important to send an email warning Plaintiff that his eyesight was at risk each time he used the *Maxfli 8x8 Instant Net* without eye protection.

193.

DSG's conduct has demonstrated, through clear and convincing evidence, its entire want of care and reckless indifference to the unreasonable and substantial risk of serious personal injury DSG subjected Plaintiff to, and suffered by Plaintiff, because DSG negligently sold Plaintiff an inherently dangerous product and continually failed to meet its ongoing duty to warn Plaintiff that the *Maxfli 8x8 Instant Net* was unsafe to use for its ordinary purpose without eye protection.

194.

Pursuant to O.C.G.A. § 51-12-5.1(e)(1), Plaintiff is entitled to have the jury consider an award of punitive damages against DSG so as to deter DSG from similar future conduct.

_____

WHEREFORE, Daniel D. Macris, having made his Complaint, prays that he have a trial by jury on all issues and for judgment against Dick's Sporting Goods, Inc. as follows:

(a)     that Defendant pay Plaintiff, in an amount greater than this Court's jurisdictional threshold, to be measured by the enlightened conscience of fair and impartial jurors, all general and special damages Plaintiff has suffered and will continue to suffer as a result of the incident, for the initial shock and intense pain of being struck suddenly in the eye, past and future pain and suffering, including disfigurement and embarrassment, loss of enjoyment of life, past and future medical/surgical expenses, including medical devices, prosthetics and accommodations for visual impairment, and that Defendant compensate  Plaintiff for diminished capacity to work and for past and future lost income;

(b)     that Defendant pay Plaintiff punitive damages in an amount to be

        measured by the enlightened conscience of fair and impartial jurors,

        and in an amount sufficient to deter Defendant from similar future

        conduct, together with an award of reasonable attorneys' fees and

        costs of litigation to be paid from what otherwise would be a part of

        the State's portion of an exemplary award under Georgia product

        liability/punitive damage law;

(c)     that all the costs be assessed against Defendant;

(d)     for such other and further relief this Court deems just and proper; and

(e)     that all issues be tried by the parties before a jury to verdict.

(Signatures on Next Page)

**RANDALL F. ROGERS, PC**
Attorneys for Plaintiff

*/s/ Randall F. Rogers /s/*
Randall F. Rogers
Georgia Bar No: 613310
Randy@RandyRogersLaw.com

*/s/ Dylan F. Rogers /s/*
Dylan F. Rogers
Georgia Bar No: 854360
Dylan@RandyRogersLaw.com

244 Roswell Street
Suite 100
Marietta, GA 30060
Telephone:  (770) 590-0300
Facsimile:   (770) 590-9111

P:\Clients\Macris, Daniel\Complaint and Initial Filings (NDGa)\Complaint (Federal Court).wpd